Filed 9/4/15  In re Nathaniel L. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re NATHANIEL L., a Person Coming Under the Juvenile Court Law. | D067280 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ11241D) |
| v. | |
| CANDY L., | |
| Defendant and Appellant; | |
| JESUS L., | |
| Appellant. | |

APPEALS from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Candy L.

Neale B. Gold, under appointment by the Court of Appeal, for Appellant Jesus L., a Minor.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Jennifer Stone, Deputy County Counsel, for Plaintiff and Respondent.

Minor Jesus L. and his mother Candy L. separately appeal an order under Welfare and Institutions Code section 366.26[1] selecting adoption as the permanent plan for Candy's son and Jesus's sibling Nathaniel L., and terminating parental rights.  Candy contends the court erred in finding that there was not a beneficial parent-child relationship between her and Nathaniel within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights.  Both Candy and Jesus contend that the court erred in finding the sibling relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(v) did not apply. We affirm.

*Overview*

The Agency detained Nathaniel and his three older siblings in April 2012 and the juvenile court assumed jurisdiction over them in June 2012.  In November 2012, Candy gave birth to her fifth child, who was not removed from her custody or made a dependent of the court.  Nathaniel was placed in foster care separately from his siblings.  In mid-2013, Nathaniel was diagnosed with a chronic, life-threatening kidney condition.  At the 18-month review hearing, the court returned Nathaniel's three older siblings to Candy's

---

[1]     All statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

custody but continued Nathaniel's foster placement largely due to his medical condition. After his condition was diagnosed, Nathaniel's medical fragility and special healthcare needs became the main focus of his dependency case and the decision to terminate parental rights as to him.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2012, the San Diego County Health and Human Services Agency (the Agency) detained and filed petitions on behalf of then one-year-old Nathaniel and his three older half siblings, eight-year-old Nevaeh, seven-year-old Mia, and five-year-old Jesus. Nathaniel's petition alleged under section 300, subdivision (j) that there was a substantial risk Nathaniel would be abused or neglected because Mia and Jesus had been sexually abused by a member of the household. In a second count, the petition alleged that Nathaniel's father, Daniel G., had hit Nathaniel's sibling with a closed fist on multiple occasions.

In forensic interviews Mia and Jesus disclosed that their maternal uncle who resided in their home had repeatedly engaged in sexual acts with them, including forcing both of them to orally copulate him. The maternal uncle confessed to police detectives that he had forced Mia and Jesus to orally copulate him and had raped Mia. He also told the detectives that he might have sodomized Jesus but did not remember. Nevaeh, Mia, and Jesus told Agency and forensic interviewers that Daniel had punched them in the chest or mouth when they were in trouble. Mia said she had been hit with a hanger and belt and had seen Candy hit Jesus in the mouth, which caused bleeding. Jesus said that Candy and Daniel hit him on the butt and that his lip bled when Daniel punched it.

3

Nevaeh, Mia, and Jesus were detained in a confidential foster home and Nathaniel was detained in his paternal uncle's home. The court ordered liberal supervised visitation for Nathaniel's parents.

The Agency's jurisdiction/disposition report filed on May 11, 2012, noted that Candy was pregnant with her fifth child and was living with the maternal grandmother. She was no longer in a relationship with Daniel due to domestic violence. She denied having any contact with the maternal uncle who sexually abused the children and did not want to have any contact with him in the future. She had used marijuana and methamphetamine in the past and completed a drug treatment program in 2009.

Candy was attending three supervised visits with the children per week and the visits had gone well. The Agency searched for a placement that would accommodate all four children, but Nathaniel remained placed with his paternal uncle while the other three children were placed together in a foster home.

At the jurisdiction/disposition hearing on June 14, 2012, Candy admitted the allegations in Nathaniel's petition and the court sustained the petition and made true findings on both counts. The court removed Nathaniel from parental custody and ordered him placed in the approved home of a relative (the paternal uncle). The court gave the social worker discretion to lift supervised visitation and expand to overnight visits or a 60-day trial visit with the concurrence of Nathaniel's counsel. The court also ordered sibling visitation.

In August 2012, the Agency rescinded its approval of the paternal uncle as a placement for Nathaniel and detained Nathaniel in a licensed foster home after it

4

discovered that the paternal uncle regularly used medical marijuana. The Agency filed a section 387 petition alleging that Nathaniel's paternal uncle was no longer able to provide adequate care and supervision for Nathaniel and recommending that Nathaniel be placed in foster care. The court ordered Nathaniel detained in an approved foster home pending further hearing. The Agency considered the older children's foster home as a possible placement for Nathaniel, but the older children's caregiver declined to have Nathaniel placed with her.

The Agency's report for the six-month review hearing noted that Candy was visiting Nathaniel twice weekly. Nathaniel's caregivers supervised one of the visits and the other took place at a visitation center with Candy and the other children. The visitation center reported that many of Candy's visits were "unorganized" and "chaotic." Candy would laugh when the children misbehaved and not redirect their behavior. She appeared to have difficulty managing all four children at the same time.

At the six-month review hearing, the court found Candy had made substantive progress with her case plan. The court continued Nathaniel's foster placement and Candy's reunification services, and ordered that Nathaniel have sibling visitation.

In May 2013, the Agency filed a report for the 12-month review hearing. The Agency reported that in November 2012 Candy had given birth to her fifth child, Sebastian G., who remained in her care. Candy and Sebastian lived with the maternal grandmother. Candy had complied and made progress with her case plan. She was allowed unsupervised visitation with the children and was in the process of starting overnight visits.

5

An "FFA Angels"[2] social worker expressed concerns about Candy's visitation with Nathaniel. Candy had transported all of the children in her vehicle although there were only five seat belts in the vehicle. She agreed to use public transportation to transport the children and later purchased a vehicle that could accommodate all of the children, but she needed to register the new vehicle. The social worker was also concerned that Candy was not bathing Nathaniel and possibly not feeding him before returning him to his foster home. Candy admitted that on two occasions she had not bathed Nathaniel before returning him—once when they were out and she did not have enough time to bath him before having to drop him off by a certain time, and once when he had been sick and she did not want to take him out into the cold after bathing him. She said she fed Nathaniel before returning him to the foster home. Nathaniel was developmentally on track but his doctor was concerned about his low weight.

At the 12-month review hearing on June 4, 2013, Candy requested that trial be set on the issue of Nathaniel's return to her custody. The court admonished Candy "regarding being lawfully permitted to drive and ensuring [Nathaniel] is properly restrained in the car." (Capitalization omitted.)

On June 10, Nathaniel's foster mother reported that when she met Candy at a park on June 6 to pick up Nathaniel, she saw Nevaeh, Mia, and Jesus hiding on the floor of the backseat of Candy's car. The foster mother waved at the three children who were hiding and they acted as if they should not have been found. The FFA social worker was

_____

2     The Agency's reference to "FFA Angels" presumably was intended as a reference to Angels Foster Family Network.

6

concerned that the incident indicated Candy was continuing to transport all four children together even though she knew she was not supposed to do so. The social worker was also "very concerned that [Candy] may be asking the children to 'hide' and thus compromising their safety and asking them to be deceitful."

At a pretrial status conference on July 16, 2013, Candy withdrew her trial set and the court continued Nathaniel's foster placement and reunification services for the parents. The court ordered that "Mother may not transport [Nathaniel] in any motor vehicle, unless Mother has a driver['s license], insurance, vehicle registration; all appropriate minor car seats, comply with California law regarding transportation and never instruct the minor to hide from the view of other vehicles." (Capitalization omitted.)

In its 18-month review report, the Agency recommended that Nevaeh, Mia, and Jesus be placed with Candy and that Nathaniel continue to be placed in his foster home. Nathaniel had recently been diagnosed with chronic kidney disease and would need a kidney transplant. His kidneys were functioning at only 30 percent, and his right kidney was worse than his left kidney. He was also diagnosed with failure to thrive. He was at .23 percent body weight for his age and needed to follow a strict diet that was high in fat and calories. Candy attended a medical appointment at Rady Children's Hospital, where Nathaniel was seen by the nephrology department and a dietician. She was provided a list of foods that Nathaniel should eat and a list of foods he should avoid.

The following day (August 27, 2013), Nathaniel was with Candy for an overnight visit. During the visit Candy fed Nathaniel food he was to avoid. The Agency expressed

7

"extreme concerns that [Candy] is [noncompliant] with [Nathaniel]'s diet." The Agency noted that Candy had a history of noncompliance and would "continue to do things even when told not to. . . . She [did] not seem to be taking [Nathaniel]'s medical needs seriously."

Nathaniel's caregiver expressed concern about Candy not attending medical appointments and not providing Nathaniel with the special diet he required. The FFA social worker also expressed concern that Candy was not providing a nutritional diet to Nathaniel on overnight visits, not providing Nathaniel a scheduled nap time, and not attending medical appointments regarding his newly discovered kidney disease.

The children's court-appointed special advocate (CASA) expressed similar concerns about Nathaniel in a report that she filed for the 18-month review hearing. The CASA stated: "I have had concerns regarding Nathaniel from the beginning, as he is the youngest and the older siblings compete for [Candy]'s attention. His recent chronic kidney disease diagnosis makes me even more concerned about his health and well-being. I feel that if he is returned to his mother he will not receive the care he needs. The three older children are aggressive in their pursuit of attention, and the mother's non-dependent baby is naturally the focus of both the mother and the other children. Nathaniel has neither the experience nor the vocabulary to make his needs known among the other four. I question whether he will receive the specialized diet he requires, or the medical attention he will eventually require." The CASA stated that her concern was "multiplied" because of a prior dependency case in which Nevaeh was removed from

8

Candy's care as an infant because she was severely underweight and Candy was not following medical directions for her care.

The Agency filed an addendum report on October 10, 2013, with an attached letter from Natalie Martinez, a certified pediatric nurse practitioner with Sharp Rees-Stealy who had followed Nathaniel's medical care for one year. Martinez noted Nathaniel had failure to thrive secondary to chronic kidney disease with renal failure. His medical goal was to gain enough weight to be eligible for a kidney transplant.

Martinez reported that because Nathaniel's "kidneys do not filter well, he needs to be on a controlled potassium, phosphorous and sodium diet. If these minerals build up in his blood at dangerous levels, they can cause problems for his bones, heart, muscles, eyes, lungs and blood vessels. He also needs to limit his sodium to prevent water retention and control blood pressure." Martinez noted that both Candy and the foster mother had been provided a detailed special diet for Nathaniel by Rady Children's renal clinic, which specifically excluded "fast foods." It had come to the medical staff's attention that Candy often took Nathaniel to McDonald's when he stayed with her and that he was often sick with abdominal pain or diarrhea when he returned to his foster home. Martinez suggested that supervision of Nathaniel's diet during his visits with Candy may be required.

In October 2013, the court placed Nathaniel's three older siblings with Candy. At the Agency's request, the court continued Nathaniel's 18-month review hearing to December 5, 2013, to provide Candy additional services to address Nathaniel's medical concerns.

9

On December 3, 2013, the Agency filed an addendum report in which it recommended that the court terminate the parents' reunification services and set a section 366.26 hearing for Nathaniel. Candy had not been following Nathaniel's special diet during her unsupervised visits with him. On October 18, 2013, the foster mother found a McDonald's flier in Nathaniel's lunch box and Nathaniel said he had eaten French fries and ketchup. On November 1, Nathaniel's daycare reported that the only thing packed for Nathaniel's lunch was a peanut butter sandwich on white bread, foods that Nathaniel was to avoid. Upon questioning Candy, the Agency learned there were at least two instances of her failure to follow Nathaniel's diet. The Agency suspected there were more occurrences, but noted it was "very difficult to find out what [Nathaniel] is really eating versus what [Candy] says she is feeding him." Nathaniel's nephrologists were concerned that Candy's disregarding Nathaniel's strict diet could become a problem for him.

On December 11, 2013, the Agency filed a petition under section 342, alleging, under section 300, subdivision (b), that there was a substantial risk Nathaniel would suffer serious physical harm or illness because Candy was not able to strictly adhere to the special diet he required. The Agency filed a detention report on December 12 that addressed Candy's failure to adhere to Nathaniel's diet, and additionally noted that Nathaniel had received a bite mark on his right cheek, a bruise on his forehead, and a rash on his left cheek during his visitation with Candy. He suffered the bruise when Candy opened a door that he and Jesus were hiding behind and the door hit his forehead. The Agency concluded that "[t]he risk of neglect in the mother's care is high and court[-]

10

ordered services are necessary to mitigate the risk of future neglect. . . . The mother has been educated on how to meet Nathaniel's special needs, however, the mother has failed to utilize the services to effectively meet Nathaniel's needs during unsupervised visits." The Agency recommended that Nathaniel continue to be placed in out-of-home care and that the parents be ordered to participate in reunification services.

At a contested adjudication and disposition hearing on the section 342 petition on January 17, 2014, the court found that Nathaniel continued to be a person described in section 300, subdivision (b). The court continued Nathaniel's foster placement and ordered additional reunification services for the parents. The court ordered Candy to attend all medical appointments for Nathaniel concerning his kidney condition and to keep a food log for him. The court found extraordinary circumstances under section 352 to continue the 18-month date and set an 18-month review hearing for April 3, 2014.

In a status review report filed on March 21, 2014, the Agency reported that Mia had disclosed that Jesus had sexually molested her multiple times. Candy responded appropriately and implemented a safety plan that included separating the children and monitoring their sleeping arrangements.

On April 3, 2014, the Agency filed an addendum report in which it again recommended that the court terminate reunification services and set a section 366.26 hearing for Nathaniel. Nathaniel's foster mother observed Nathaniel fondling his penis on March 15 and 16, 2014. She asked him if anyone had touched his penis and he replied that both Jesus and Mia had touched it. The Agency temporarily canceled Candy's

11

overnight visits with Nathaniel pending an investigation of the matter. Candy told the social worker that Jesus admitted he had touched Mia but denied touching Nathaniel.

The Agency filed an addendum report on April 3, 2014, that included a letter from the Angels Foster Family Network social worker who had worked with Nathaniel and his foster parents for one and a half years. The social worker noted that Candy had not consistently attended Nathaniel's medical appointments, had been late to appointments, and often did not pay attention during appointments. She had to be prompted to pay attention, and she did not take notes or ask questions about Nathaniel's care or condition. Candy was dismissive of Nathaniel's medical condition, stating that she knew "someone else who had the same thing as Nathaniel" and they "got better." Candy also had remarked that she did not believe Nathaniel was born with his kidney condition and that it was the result of being removed from her. Nathaniel's doctors explained to Candy that Nathaniel's condition would never improve.

The Agency's assessment was that the parents were not capable of meeting Nathaniel's special needs or able to adequately supervise him on a full-time basis. The Agency reported that Candy had made some progress in being able to meet Nathaniel's special needs, but not substantial progress. In addendum reports filed on May 7 and June 3, 2014, the Agency reiterated that assessment and recommended that the court terminate reunification services and set a section 366.26 hearing.

In the latter addendum, the Agency reported that Walmart employees called the police to report that Mia and Sebastian had been left unattended in a van for over a half an hour. The police arrived 15 minutes later and Candy returned to the van 15 minutes

12

after the police arrived. Thus, the children were unattended in the van for over one hour. The windows were rolled up and the car was not running. Sebastian was asleep in his car seat and was drenched, and Mia had sweat beads on her forehead. Candy claimed she was in Walmart for only 10 to 15 minutes. She told the Agency social worker that Mia did not want to go into the store because she had just hurt her ankle at a gas station, and that she did not take Sebastian into the store because Mia asked her to leave him in the car with her. Candy agreed to a safety plan that included never leaving the children unsupervised in the home, vehicle, or in public.

The June 3 addendum report included another letter from pediatric nurse practitioner Martinez. Martinez reported that Nathaniel was "at the 1 percentile for height and weight." He had been cleared for a kidney transplant, but to postpone that surgery as long as possible, it was of the "utmost importance" that his daily health care needs were met. In addition to his special diet and medications, Nathaniel needed to receive daily growth hormone injections that had "to be given in a clean environment by a responsible person who has been trained to do this and is competent in the skill." The injections were currently being given only by his foster mother, who had been trained to give them and whose household met the appropriate standards. Martinez also noted that it was important that Nathaniel not have infections. She stressed the need to maintain a clean environment and to avoid being around others who were sick. Martinez also advised that Nathaniel should be in a safe and stable household without undue stress. In summary, Martinez stated that "Nathaniel's growth and developmental success . . . is dependent on maintaining a rigorously healthy and structured environment. Since he is a

13

medically fragile child, deviation from this can be detrimental to his health. Optimizing his health has a direct impact on his long[-]term survival and avoiding any unnecessary complications."

The court held the contested 18-month review hearing over two days in June 2014 and heard testimony from the Agency social worker and Candy. The court noted Candy had made some limited progress with services concerning Nathaniel's medical condition, but stated "it was insubstantial progress on the key issues that go directly to the safety and well-being of Nathaniel." The court terminated the parents' reunification services and set a section 366.26 hearing for October 23, 2014.

Social worker Charese Phillips prepared the Agency's section 366.26 report dated October 23, 2014, which included the Agency's recommendation that the court terminate parental rights and order adoption as Nathaniel's permanent plan. Nathaniel's food journal showed that Candy was struggling to follow Nathaniel's special diet, which required, among other things, foods that were low in sodium per serving.

Phillips observed four of Candy's unsupervised visits with Nathaniel. In August 2014, she attended for approximately one hour a visit that Nathaniel had with Candy, his siblings, and the maternal grandmother at Candy's apartment. The apartment was warm and stuffy and smelled of urine and trash. There were numerous flies in the apartment and there was dirt on the carpet, trash piled in the trash can, and dirty dishes in the sink. The kitchen table was sticky and the children were all barefoot and the bottoms of their feet were grey with dirt. Nathaniel, Jesus, and Sebastian had difficulty sharing their toys and often became upset and cried. When Candy tried to redirect them, they often did not

14

listen. Candy denied that she had ever had difficulty following Nathaniel's diet, and complained that the diet was often changed so that foods that were allowed one day were not allowed the next. Both Candy and the maternal grandmother implied that Nathaniel was not ill and that the foster mother was making him sick.

Phillips observed three additional unsupervised visits between Candy, Nathaniel, and Sebastian in September 2014 at Candy's apartment. Nathaniel and Sebastian had difficulty sharing their toys during the visits and often became upset and cried and did not listen when Candy attempted to redirect them. During one of the visits, Nathaniel had diarrhea in his diaper and Candy was unable to find wipes. During the next visit Nathaniel asked to brush his teeth while Candy was dressing him. Candy could not locate his toothbrush. When Phillips arrived at Candy's apartment to observe a fifth visit, Candy told Phillips she was not ready. The apartment smelled strongly of urine and dirty diapers and there were items strewn all over the living room, including toys, clothes, and bed linens. Candy explained that Jesus made the mess when he became angry because she told him he could not play outside.

Nathaniel's caregiver reported that Nathaniel separated from Candy at the end of visits without emotional turmoil. After visits, he was overly tired and "cranky," and would use curse words and display more aggressive behavior than usual. When Phillips spoke with the caregiver about different permanent plan options for Nathaniel, the caregiver immediately indicated that she and her husband preferred to adopt Nathaniel, and in later discussions reaffirmed that she and her family were committed to offering Nathaniel permanence through adoption.

15

Phillips assessed Nathaniel to be specifically and generally adoptable and, on behalf of the Agency, recommended adoption as his permanent plan. Phillips acknowledged that Nathaniel and Candy cared for each other and that spending time with Candy was a fun and positive experience for Nathaniel. However, she concluded that "[t]he significance of this relationship . . . does not outweigh the benefits of Nathaniel being placed in a permanent home that has the ability to meet his significant medical needs. . . . Nathaniel shows no signs of emotional distress when separating from the mother, nor does he ask for her when he is with the caregivers. Furthermore, the mother's continued difficulty with following Nathaniel's strict diet and her loose supervision of him around his siblings calls into question her judgment and capacity to remain in a parental role."

Phillips concluded that Nathaniel's bond with his siblings was "not so significant that it would outweigh the benefits of permanency for Nathaniel. He appears to enjoy spending time with his siblings, however, he does not ask for his siblings when he is not with them, nor does he have difficulty separating from them at the end of their visits. Based on Nathaniel's significant medical needs, and the fact that he is a preschooler who has been in the dependency system for 30 of his 45 months of age, he is in critical need of the permanence and stability that adoption provides. These needs far outweigh any detriment that severing the sibling bond may cause Nathaniel."

The CASA filed a report dated October 23, 2014, in which she recommended adoption as Nathaniel's permanent plan. The CASA observed Nathaniel in Candy's home twice. The CASA reported that the home appeared dirty and disorganized and although

16

Candy responded to Nathaniel's needs when he asked for something, "she did not seem interested in interacting with Nathaniel or concerned about his interactions with [the CASA] or his siblings." The CASA concluded: "Though Nathaniel does have a relationship with his mother and siblings, I believe the risks of him being in an unsafe environment are greater to his health and well-being than the separation from these family members, [whom] he has not lived with on a full-time basis for the majority of his life."

On the date initially set for the section 366.26 hearing, Candy requested a trial on the issues of the parent-child bond and the sibling bond exception. The court ordered that Nathaniel be made available for a bonding study upon Candy's request and set the section 366.26 hearing for December 12, 2014.

Phillips filed an addendum report on November 25, 2014, noting that on October 8, 2014, the caregiver reported that Nathaniel had lice after he returned home from an overnight visit with Candy. Candy denied that she or her children had lice, but bought a new mattress and box spring and the carpet in her apartment was changed. When the caregiver picked Nathaniel up from an overnight visit on November 3, he fell asleep for four to five hours, which was unusual for him. The caregiver called Candy to ask if anything had happened during the visit. Candy told her that she had mistakenly sent Nathaniel home with the maternal grandmother's medication, but denied that she had given Nathaniel the medication.

On November 9, 2014, the caregiver reported that Nathaniel had a severe and painful diaper rash when returned from a visit with Candy. Candy told the caregiver that

17

Nathaniel's diaper had become saturated with urine and overflowed onto his clothing and the floor. The caregiver took Nathaniel to urgent care where he was diagnosed with a highly contagious fungal infection and prescribed appropriate medication. Candy did not attend a doctor's appointment for Nathaniel the next morning. Phillips filed a second addendum report on December 11, 2014, to report that on November 22, Candy took Nathaniel to the emergency room because he had been vomiting all evening, had not eaten anything, and was listless and fatigued. Nathaniel was transferred to Rady Children's Hospital where he was treated for dehydration and released.

Section 388 petitions

On November 12, 2014, Nevaeh, Jesus, and Mia filed section 388 petitions requesting to participate in Nathaniel's case and to present argument and evidence regarding the sibling relationship exception to adoption. On December 2, 2014, Daniel filed a section 388 petition requesting that Nathaniel be returned to his care or, alternatively, that the court order a transition plan to expand his visitation with Nathaniel to facilitate placement with him. The court granted "the siblings' request to participate in the trial[,]" but denied Daniel's petition. (Capitalization omitted.)

Section 366.26 hearing

The court held a contested section 366.26 hearing over two days—December 12 and December 29, 2014. On the first day of the hearing the court received into evidence the section 366.26 report dated October 23, 2014; the addendum reports filed on November 25 and December 11, 2015; and the CASA's report dated October 23, 2014. The court heard testimony from social worker Phillips, and the parties stipulated to

18

testimony from Nathaniel's older siblings. Nevaeh's and Mia's stipulated testimony was that they loved Nathaniel and did not want him to be adopted; they wanted to live with Nathaniel; they would be sad if they could not visit Nathaniel; when he visits they play with him and watch his favorite television shows with him; and they would like to see him more than once a week. Jesus's stipulated testimony was that he wanted Nathaniel "to stay with us[;]" he liked playing and visiting with Nathaniel and let him win when they played together; he would be sad if he could not see Nathaniel anymore and would feel angry if Nathaniel "was taken away from us."

When the hearing continued on December 29, the court received into evidence a bonding study authored by Sonia Carbonell, Psy.D., a psychologist, and her curriculum vitae. The study assessed the bond between Candy and Nathaniel. Based on her observations of interactions between Candy and Nathaniel and her "review of literature explaining the basis of attachment [as] part of the theoretical framework used for [her] opinion[,]" Dr. Carbonell concluded that severing Nathaniel's "natural parent-child relationship should greatly deprive Nathaniel of a substantial, positive emotional attachment such that the child would be greatly harmed." Dr. Carbonell noted that although the foster mother spoke to Nathaniel exclusively in Spanish, he responded to her predominately in English, which is Candy's language of preference. Dr. Carbonell stated that "Nathaniel's language preference suggests that the birth mother continues to be his primary attachment."

The court also received into evidence an Agency addendum report filed on December 24, 2014. The report included criticism of Dr. Carbonell's bonding study and a

19

paper by a psychologist entitled "Second Language Acquisition in Early Childhood," in which the author notes that when a young child is learning two languages simultaneously, it is normal for one language to predominate as the child learns and becomes more comfortable with the second language.

After hearing argument on the section 366.26 issues, the court found by clear and convincing evidence that Nathaniel was likely to be adopted and that none of the circumstances specified in section 366.26, subdivision (c)(1)(B) that would make termination of parental rights detrimental to him existed. The court acknowledged that termination of parental rights would affect Nathaniel's sibling relationships, but found that maintaining those relationships did not outweigh the benefits of adoption.

The court acknowledged there was "a bond or a relationship" with Candy but thought Nathaniel had developed more of a mother-child relationship with his foster mother. The court concluded: " . . . I do not find that it has been established . . . or there is evidence supporting a conclusion that severing a natural parent[-]child relationship would deprive Nathaniel of a substantial positive emotional attachment such that he would be greatly harmed." The court found that Dr. Carbonell's conclusion to the contrary was largely "based on theory and not so much on what is before the [c]ourt."

Considering Nathaniel's special needs, the court added: "I think it would be a travesty for him if he remained in a permanent plan that was foster care, quite frankly, and the instability of foster care." The court rejected a suggestion by Candy's counsel that "we should grill the foster mother as to whether she really meant that she didn't --

20

that she wouldn't consider legal guardianship first, I note the benefits of adoption for this child are extraordinary. Permanence is extraordinary."

The court terminated parental rights and referred Nathaniel to the Agency for adoptive placement.

DISCUSSION

I. *Beneficial Parent-Child Relationship Exception*

Candy contends the court erred in finding that there was not a beneficial parent-child relationship between her and Nathaniel within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of her parental rights. " 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165 (*G.B.*).)

This court has interpreted "the 'benefit from continuing the [parent[-]child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home

21

with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." ' [Citation.] For the exception to apply, 'a *parental* relationship is necessary[.]' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." ' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 (*J.C.*).) The court's finding on the issue is reviewed under the substantial evidence rule. (*Autumn H., supra,* 27 Cal.App.4th at p. 576.) Under that rule "we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to

22

be accepted by the trier of fact." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53 (*Casey D.*).)[3]

We conclude that Candy has not met her burden of establishing that the beneficial relationship exception to adoption applies. There is ample evidence in the record to support the finding that Candy failed to assume a parental role in Nathaniel's life, especially with respect to Nathaniel's special medical needs. In considering whether Candy occupied a parental role, and in weighing the harm Nathaniel would suffer from severance of the Candy's parental relationship against the benefits he would gain from being adopted by his foster parents, the court's primary focus was properly on Nathaniel's fragile medical condition and special needs.

Nathaniel's medical providers, through pediatric nurse Martinez, emphasized the "utmost importance" of meeting his health care needs, which include taking medications, receiving daily growth hormone injections, strictly adhering to a special diet, and living

3    The Agency articulates the hybrid standard of review applied in *In re Bailey J.* (2010) 189 Cal.App.4th 1308 (*Bailey J.*) and *J.C.*, *supra,* 226 Cal.App.4th 503. In published opinions, this court has consistently applied the substantial evidence standard of review to challenges to orders determining the applicability of exceptions to adoption. (See, e.g., *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *In re Megan S.* (2002) 104 Cal.App.4th 247, 250-251; *In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333-1334; *In re Michael G.* (2012) 203 Cal.App.4th 580, 593-594 (*Michael G.*).) We need not decide whether to apply the hybrid standard in this case because applying that standard of review would not result in a different outcome. The analysis is essentially the same under either standard of review because " '[e]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order [under review].' " ' " (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

in a clean and safe environment. Martinez explained that Nathaniel is a "medically fragile" child whose growth, developmental success, and long-term survival depend on his being in a "rigorously healthy and structured environment."

There was substantial evidence that Candy repeatedly fell short of meeting Nathaniel's critical medical needs. She repeatedly failed to adhere to his strict diet and exposed him to unsanitary conditions. During a visit that Phillips observed, there were flies in Candy's apartment, dirt on the carpet, trash piled in the trash can, and dirty dishes in the sink. Nathaniel returned to his caregiver from a later visit with a painful diaper rash and fungal infection caused by a saturated diaper. During another visit Candy took Nathaniel to the emergency room where he was treated for dehydration. He also received a bite mark on his right cheek, a bruise on his forehead, and a rash on his left cheek during his visitation with Candy. The CASA reported that Nathaniel had returned to his foster home from visits with Candy "with a fat lip, exhausted, and with diarrhea."

There was evidence that Candy did not take Nathaniel's kidney condition seriously despite the information she was provided about the seriousness of the condition. She did not consistently attend his medical appointments and was late for appointments. She had to be prompted to pay attention and did not take notes or ask questions about Nathaniel's condition during appointments. She was dismissive of Nathaniel's medical condition, stating that she knew "someone else who had the same thing as Nathaniel" and they "got better." She said she did not believe Nathaniel was born with his kidney condition and that it was the result of being removed from her.

24

In addition to evidence that Candy neglected Nathaniel's medical needs, there was evidence that she had other lapses in judgment that put her children at risk of harm. She had transported her children in a vehicle without enough seat belts for all of them and instructed them to hide on the vehicle floor from Nathaniel's foster mother to conceal that fact. She left Mia and Sebastian unattended in her vehicle van for over one hour in a Walmart parking lot. Nevaeh had been removed from Candy's care as an infant in a prior dependency case because she was severely underweight and Candy did not follow medical directions for her care.

Phillips assessed Candy as being incapable of meeting Nathaniel's special needs and reported that her "continued difficulty with following Nathaniel's strict diet and her loose supervision of him around his siblings calls into question her judgment and capacity to remain in a parental role." The CASA expressed similar concerns that if Nathaniel were returned to Candy, he would not receive the care he needs. She observed that Candy seemed to be struggling to meet her family's needs while having her other four children in her care. The CASA believed that "the addition of Nathaniel into this situation on a permanent basis, especially due to his medical condition, would only exacerbate [Candy]'s inability to keep her children safe and healthy." She further believed that Nathaniel was doing as well as he was "because of the stable environment of his foster home[] that he is in six nights a week. If not receiving his medication regularly and eating the appropriate diet, Nathaniel could quickly go into kidney failure and require dialysis and transplant at a much younger age than necessary." The CASA noted that although Nathaniel had a relationship with Candy and his siblings, he had not

25

lived with them on a full-time basis for most of his life. She concluded that Nathaniel's being in an unsafe environment was a greater risk to his health and well-being than separation from Candy and his siblings.

There was substantial evidence that Nathaniel was thriving in his foster home. The foster mother reported that Nathaniel showed no signs of emotional distress when separating from Candy at the end of visits. The CASA reported that the foster parents were "very attentive caregivers, and are engaged in ensuring Nathaniel receives the medical care he needs." The foster mother was trained and competent to give Nathaniel his daily growth hormone injections, which had to be given in a clean environment, and her household met the necessary cleanliness standards. The CASA believed Nathaniel's foster placement was a "wonderful environment for Nathaniel and has proven to benefit his growth and development, along with his overall health." Phillips reported that both foster parents loved Nathaniel unconditionally and made meeting his medical needs a top priority. Her assessment was that Nathaniel's placement was a safe and nurturing home with caregivers who would consistently meet his medical, developmental, educational, and emotional needs.

In its oral ruling, the court noted that Nathaniel would need a kidney transplant in the future and stated it had "relied on the medical assessments . . . of the need . . . of being in a clean home. A home that will keep him infection free, that follows routines and that can meet his medical needs, including the administration of medications to him . . . . And ultimately be a home that can also meet his needs as he ultimately recovers from a kidney transplant . . . ." The court further noted "how debilitating it is for

26

[Nathaniel ] when the routine is not followed, when the diet is not acknowledged and followed, when he's exposed to filth or germs that can make him sick, or a fungus that can make him sick and perhaps unavailable should he get to the point where he's in need of a transplant. [¶] . . . And so I note in terms of his physical and medical needs, [Nathaniel] deserves a permanent, loving home [and caregiver] that can say I will stick by you no matter how sick you get, what the needs are[—][w]ho can be with him when procedures are painful. [¶] . . . He's different now than other almost[-]four-year-olds . . . . He's a child that still has to be watched like a much younger child because of the restrictions on his diet, because of the need of cleanliness and order."

The court found that Nathaniel had "thrived" and "done exceedingly well" in his current caregivers' home, which had "provided him permanence." The court found that the benefits of Nathaniel being adopted by someone who is "mindful of all of his whole constellation of needs is extraordinary[,]" and further found that "the benefits to date that he's enjoyed under the [c]ourt's supervision with a stable, loving and nurturing and medically mindful home are particularly extraordinary." The evidence before the court strongly supported these findings.

Candy cites Dr. Carbonell's bonding study as expert evidence supporting a finding that she and Nathaniel share a strong attachment and that Nathaniel would suffer great harm if their relationship were severed. The court stated that it had carefully considered Dr. Carbonell's curriculum vitae and bonding study. The court noted that Dr. Carbonell reviewed only the Agency's detention report, section 366.26 report, and April 3, 2014, addendum report and thus did not have "the benefit of reviewing the many, many more

reports, even that preexist the [section 366.]26 report." As an example, the court noted Dr. Carbonell did not have the benefit of much of the information regarding the physical effects of Nathaniel's past visitation with Candy, including "illnesses or coming back with bruises, bumps, fungal infection relating to a dirty diaper, very severe diarrhea, having to be sent to the hospital. A failure to give appropriate and careful supervision of the child while he was in the mother's home." The court believed that Dr. Carbonell's assessment was "affected by the limited amount of information that she had."

The court further noted that Dr. Carbonell viewed this case "as a competition or a conflict of interest between the foster mother and the birth mother." The court disagreed with that view and stated that it thought "Dr. Carbonell jumped to a conclusion without having reviewed [all of the relevant information]." The court found that "the multitude of evidence" did not support Dr. Carbonell's view that Candy's struggle to comply with medical directives was in part due to the foster mother's behavior. The court stated that it had "significant concerns that Dr. Carbonell, having not reviewed all of the information in the case, is essentially seeing this through a lens of [it being] foster mother versus mother. . . . And so in this [c]ourt's mind, . . . it lessens the credibility of [Dr. Carbonell's] report." The court was "not overly persuaded" by Dr. Carbonell's conclusion that Nathaniel's language preference indicated his primary attachment was to Candy, noting that Dr. Carbonell did not support that conclusion with any citation to authority.

It is the trial court's role to assess the credibility of witnesses and resolve the conflicts in the evidence; we cannot reweigh the evidence, second-guess the trial court's credibility determinations, or substitute our judgment for that of the trial court. (*Casey*

28

*D., supra,* 70 Cal.App.4th at pp. 52-53.) The juvenile court was entitled to give Dr. Carbonell's opinion little weight as not being based on a review of the entire record. Further, as the Agency's and Nathaniel's counsel both argued and the court observed, none of the research that Dr. Carbonell cited in her bonding study addressed language preference as an indicator of a primary attachment. Thus, her suggestion that Nathaniel's preference to speak in English evidences a primary attachment with Candy was unfounded. The court was entitled to give greater weight to Phillips's opinions and assessments (*id.* at p. 53), and to find the CASA credible. Substantial evidence supports the court's finding that there was not a parent-child relationship between Candy and Nathaniel within the meaning of section 366.26, subdivision (c)(1)(B)(i) that precluded the termination of parental rights.

## II. *Beneficial Sibling Relationship Exception*

Candy and Jesus contend that the court erred in finding the sibling relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(v) did not apply. As noted, " '[o]nce the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).' " (*G.B., supra,* 227 Cal.App.4th at p. 1165.) " 'The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' " (*In re Hector A.* (2005) 125 Cal.App.4th 783, 791.)

"The sibling relationship exception applies where the juvenile court finds that 'substantial interference with a child's sibling relationship' is a 'compelling reason' to conclude that adoption would be detrimental to the child. In making this determination, the court should take into consideration 'the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.' (§ 366.26, subd. (c)(1)(B)(v).)" (*Bailey J., supra,* 189 Cal.App.4th at p. 1317.) "A sufficiency of the evidence standard of review applies to the sibling relationship exception." (*In re D.M.* (2012) 205 Cal.App.4th 283, 291 (*D.M.*).)

The statutory language requiring the court to find a *compelling* reason to determine that *substantial interference* with a sibling relationship would be *detrimental* to the child creates "a heavy burden for the party opposing adoption. . . . Furthermore, the language focuses exclusively on the benefits and burdens *to the adoptive child, not the other siblings*. The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 (*Daniel H.*), italics added.) "[A]pplication of the sibling relationship exception will be rare, particularly when the proceedings concern a young child . . . whose need for a competent, attentive and caring parent is paramount."

(*Michael G., supra,* 203 Cal.App.4th at p. 593; *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014.)

In the present case, the court found that maintaining Nathaniel's sibling relationships did not outweigh the benefits of adoption. The court stated it had considered the statutory factors, including the fact that Nathaniel had lived with his three older siblings for the first 15 of the 47 months of his life, and had been having overnight visits with his siblings during the past year. The court also considered the nature of Nathaniel's sibling relationships as reflected in the reports of his visitation and noted that "Nathaniel clearly enjoys his visitation with his siblings." The court concluded: "And having considered all of the factors and noting the extreme benefits of legal permanence and stability through adoption, I do not find that . . . the sibling relationship exception has been demonstrated. [¶] I do not . . . find that it has been demonstrated maintaining the sibling relationship outweighs the benefits of adoption. The court acknowledged that termination of parental rights would affect Nathaniel's sibling relationships, but correctly noted, "That's not the primary focus. I'm more focused on the balancing in terms of whether the benefits of adoption outweigh the maintenance of the sibling relationship and having taken into consideration everything that the statute requires the [c]ourt to do." The court found that the benefit Nathaniel would gain from being adopted by his foster parents was "extraordinary," and that the benefits he had "to date . . . enjoyed . . . with a stable, loving and nurturing and medically mindful home are particularly extraordinary." The court stated it was "mindful of the impact on [the siblings], but the focus of this

31

particular hearing is the impact on . . . Nathaniel, so I do not find that [the sibling relationship] exception exists."

The court's assessment was reasonable and supported by substantial evidence. As this court has noted, the juvenile court " 'must balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer.' " (*D.M., supra,* 205 Cal.App.4th at p. 293.) In doing so here, the court properly considered Nathaniel's best interests rather than the siblings' best interests (*Daniel H., supra,* 99 Cal.App.4th at p. 813), and reasonably determined that adoption would be more beneficial than detrimental to *Nathaniel,* notwithstanding his sibling relationships. In addition to being a young child, Nathaniel has a life-threatening medical condition that makes his need for "competent, attentive and caring" parents especially "paramount." (*Michael G., supra,* 203 Cal.App.4th at p. 593.)

The court's finding that the benefit Nathaniel would gain from adoption outweighed any detriment he would suffer from severing his sibling relationships is amply supported by the above-noted evidence regarding Nathaniel's visitation with his siblings, the evidence that Candy repeatedly had difficulty following Nathaniel's strict diet and otherwise meeting his special medical needs, the evidence that her home environment increased the risks to his health and well-being, and the evidence that his foster parents provided him excellent care and were attentive to his medical and other needs. Nathaniel was a medically fragile child who needed a safe and clean environment to help prevent him from getting infections. During his visits with his siblings, he had

32

sustained scratches and bruises, acquired a fungal infection, and been treated for dehydration. Phillips reported that although Nathaniel enjoyed spending time with his siblings, he did not ask for them when they were apart and did not have difficulty separating from them at the end of visits. She also reported that that both foster parents loved Nathaniel unconditionally and made meeting his medical needs a top priority. Her assessment was that Nathaniel's placement was a safe and nurturing home with caregivers who would consistently meet his medical, developmental, educational, and emotional needs. Based on Phillips's assessment and the other evidence before the court, the court reasonably found that the benefit Nathaniel would gain from the permanency of adoption substantially outweighed any benefit he would gain from maintaining his sibling relationships.

Jesus contends the court's finding on the sibling relationship exception is not supported by substantial evidence because it was largely based on Phillips's "inherently improbable" opinion that the exception did not apply. He argues that Phillips's opinion was "inherently improbable" because she spent only one hour observing Nathaniel with all of his siblings and did not "rely on a broad or deep understanding of the scientific literature."

Phillips's opinion was not inherently improbable evidence. A witness's statements are properly rejected as inherently improbable where there exists " 'either a physical impossibility that they are true, or their falsity [is] apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive

33

province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492.) Evidence may be disregarded as inherently improbable only when it is "wholly unacceptable to reasonable minds . . . ." (*Kircher v. Atchison, T. & S.F.R. Co.* (1948) 32 Cal.2d 176, 183; *Tamble v. Downey* (1951) 104 Cal.App.2d 810, 812 ["Inherent improbability only exists when no reasonable person could believe the testimony."].)

Nothing in Phillips's reports and assessments meets the case law definition of "inherently improbable" evidence. Phillips's opinion regarding the sibling relationship exception was based on her review of the entire file, her experience as an Agency social worker, her firsthand observations of Candy and Nathaniel during four visits, including one where all four siblings were present, and her conversations with Candy and other relevant parties. The fact that Phillips's opinion was not expressly based in part on scientific literature does not render it inherently improbable or lacking in evidentiary support. The court reasonably relied on Phillips's opinion in deciding whether the sibling relationship exception applied, and it is disingenuous to suggest that no reasonable person could find her opinion credible. Substantial evidence supports the court's finding that the sibling relationship to adoption did not apply.

DISPOSITION

The order selecting adoption as the permanent plan for Nathaniel and terminating parental rights is affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.